Brown Shoe Company

*v.*

John H. Reed.

350 S. W. 2d 65.

(*Jackson,* April Term, 1961.)

Opinion filed July 26, 1961.

Rehearing Denied October 20, 1961.

GAYLE, MALONE, Trenton, SENTER & SENTER, Humboldt, for plaintiff in error.

R. R. HAGGARD, JR., Waynesboro, W. W. LACKEY, Savannah, for defendant in error.

Mʀ. Jᴜsᴛɪᴄᴇ Bᴜʀɴᴇᴛᴛ delivered the opinion of the Court.

This is a Workmen's Compensation suit brought and prosecuted pursuant to Section 50-901 et seq., T.C.A. After hearing the case fully the trial judge found in favor of the injured employee and against the Shoe Company and awarded compensation. An appeal has been season-ably perfected, able briefs filed, and arguments heard. After considerable study of the record, briefs and other authorities we have the matter for disposition.

The alleged injury of Reed happened as a result of repeated movement of the left hand and arm of Reed in the operation of a machine in trimming soles on shoes, the work being designated as "rough trimming". In doing this work a severe strain was placed on the arm of Reed, and in so doing this "rough trimming" it appears that the ulnar nerve of Reed, which is sometimes designated as

the "funny-bone" nerve, repeatedly jumped out of its normal position and rubbed across the end of one of the bones of the elbow. Doctors testify to this injury as the "repeated movement of the ulnar nerve in and out of the groove which it normally occupies." This repeated movement of the ulnar nerve across the end of the bone, each such movement in effect being a separate traumatic injury to the nerve, resulted in the injuries for which compensation was sought and allowed.

The trial judge made a very comprehensive finding of fact. We have read this record and find that unquestionably this finding of fact is supported by material evidence. It is true that in some instances there is proof to the contrary or other conclusions might be drawn from the statements of different witnesses as read together, but taking the record as a whole we find that unquestionably there is material evidence to support this finding of the trial judge. After all, he saw and heard these witnesses testify, except the doctors who testified by depositions, and his finding as to their credibility is binding on us. When such a finding is supported by material evidence as herein we are likewise bound thereby. The trial judge in part found:

"The employee apparently thought little about this tiring or paining but assumed that he would become accustomed to this strain on his arm and particularly the left arm, as he continued to perform such work. This went on for some length of time and the soreness or pain in the left arm of the employee subsided overnight but apparently usually returned upon his use of the arm in the particular manner required by the job the following day. It seems that this employee was

subsequently on one or more occasions taken off of this rough trimming job, and during such period or periods the pain or soreness subsided, but on his returning to such rough trimming the pain would again commence. Later, however, such pain or soreness in the left hand and arm of the employee began to be continuous. Finally, in about the latter part of 1958 or early 1959, the employee reported to the First Aid Office maintained at this Brown Shoe Company plant where the person in charge suggested that he soak the arm in hot water. This the employee did for some weeks. Then in the early part of March, 1959, the employee noticed that the thickness of the flesh between the thumb and forefinger on his left hand was somewhat smaller than that of the right hand, and since the pain in the left arm and hand had not subsided by the hot soaking recommended to him, the employee went to his physician in Savannah, Dr. T. R. Williams.

"Dr. Williams noticed that the employee had an atrophy of the web muscles of the left hand which would normally be caused by an injury to the ulnar nerve, or the funny bone nerve. Dr. Williams first suggested that the employee use the arm as little as possible and see if it did not get better. When the condition of the hand failed to improve in a few weeks, Dr. Williams referred the employee to a neuro surgeon in Memphis, Tennessee, for examination, and later, after such examination by the neuro surgeon and the report by the neuro surgeon to Dr. Williams, Dr. Williams recommended to the employee that he not use his left arm and that he have an operation to prevent further damage to the nerve. It was thus on the recommendation of doctors that the employee declined to use his

left arm so as to prevent further injury thereto and disability therefrom.

"This injury apparently affected the employee by causing numbness in the little finger and ring finger and the portion of the hand between these fingers and the wrist. It also caused a shrinking or withering of the muscles between the thumb and forefinger of the left hand. It likewise caused him to lose his ability to grip tightly and caused some pain and numbness in the arm. After such recommendation by the doctor that he not use his left hand and arm at all, the employee again talked with the superintendent of the Brown Shoe Company plant in Savannah with respect to his condition and the recommendation of the doctors. Since there were no other jobs available at the plant which could be performed by the employee without using his left hand and arm, the employee accordingly quit his job on April 27, 1959, and the Court finds that April 27, 1959, is the date of the disabling injury received by the employee. The employee has not worked since April 27, 1959."

The primary and basic question made on this appeal is that this injury, if any, suffered by the employee was not a compensable injury, and that no notice was given of the injury until long after it happened and no suit was brought within a year from the happening of the injury. Thus without repeating the assignments seriatim, we will deal with these various questions hereinafter.

■ Of course, under subdivision (d), Section 50-902, injury and personal injury are defined and it is said that they "shall mean any injury by accident arising out

of and in the course of employment * * *." In our research on the matter we have run into what we consider one of the best definitions of an injury applicable to these Workmen Compensation cases. This is: "In common speech the word 'injury,' as applied to a personal injury to a human being, includes whatever lesion or change in any part of the system produces harm or pain or lessened facility of the natural use of any bodily activity or capability." Burn's Case, 218 Mass. 8, 105 N.E. 601, 603.

This record shows that the injury to this employee was the result of repeated trauma to the ulnar nerve caused by the constant and continued maneuvering of the left arm of petitioner while placing considerable strain thereon, all of which occurred while he was working for the defendant. This statement is conceded by the defendants and they take the position that if this was an injury the employee should have called the attention of his employer to this fact when he first began to have the pain. This though, as shown by the finding of fact of the trial judge above, would not necessarily follow because when he would quit doing this or was off at times this pain would ease up and it really wasn't until just about the time he went to the foreman, Trent, and the First Aid Station that there seemed to be any particular worry, or that he knew that he had any extended injury or disability.

The suit herein was instituted on October 3, 1959. He first learned of any extended injury in the spring or early part of 1959, or about the time, as found by the trial judge, that he was laid off on the advice of these doctors after going to his foreman and to the First Aid Station in March or April of that year. Thus it unquestionably

appears from this proof that these repeated injuries to this nerve, no one of which resulted in disabling him, but the accumulation of which, resulted in substantial permanent disability to this arm. Thus it was that both doctors, Williams and Ingram, testified that this repeated movement, several hundred times daily, day after day, caused the slipping and irritation of the ulnar nerve and eventually caused neuritis of the nerve, pain and atrophy.

As a result of this there was numbness to the fingers, loss of sensation, and atrophy, and this was the natural result of the irritation and the neuritis of this nerve caused by these repeated movements. This repeated trauma to these nerves produced this injury and there was no intervening bacteriological or other infectious process or cause of the injury or disability according to Dr. Ingram.

■■ We have given above the statutory as well as an excellent definition of what injury is. Now we must see whether or not under the factual situation herein if this injury was an accident as is used in the Workmen's Compensation Law. An accident is generally an unlooked for mishap, an untoward event, which is not expected or designed. Generally in most such cases this Court has repeatedly said that a compensable injury should be the result of something happening by accidental means though the act involving the accident was intentional. Accidental means ordinarily mean an effect which was not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design

of producing. It is produced by means which were neither designed nor calculated to cause it. It cannot be reasonably anticipated, it is unexpected, it is produced by unusual combinations of fortuitous circumstances and such an injury is an injury by accidental means.

█ The injury claimed in the instant case is classed in various works on Workmen's Compensation as a gradual injury. Mr. Larson in Vol. 1 of his work on Workmen's Compensation at Section 39 says:

"Most jurisdictions will regard the time of accident as sufficiently definite if either the cause is reasonably limited in time or the result materializes at an identifiable point. In the absence of definiteness in time of either cause or effect, as when repeated impacts or inhalations gradually produce disability, many courts find accident by treating each impact or inhalation as a separate accident."

Then follows Section 39.10, wherein this question is discussed at length and in a footnote following the discussion are cases from most State jurisdictions as well as Federal jurisdictions including in these notes many related circumstances to those in the instant case. In this footnote on gradual injuries our case of *Shaw Co. v. Musgrave*, 189 Tenn. 1, 222 S.W.2d 22, is cited, which was an infection caused from continued impacts of a band saw on the chest. In the footnote there are likewise cases pointed out which do not allow compensation in gradual injury cases, but the author points out that in these cases the injury was not sufficiently definite and probably this is the reason that compensation was denied. The author in this Section (39.10), at page 569 says:

"It is safe to say, however, that on the strength of one or more of these reasons, most jurisdictions have at some time awarded compensation for conditions that have developed, not instantaneously, but gradually over periods ranging from a few hours to several decades, culminating in disability from silicosis and other dust diseases, (naming various and sundry things which would be included in the occupational disease statute including bursitis and other injuries that do not come within the occupational disease category but are covered as accidental injuries alone) * * *."

While we are discussing these things that Mr. Larson says we found in Section 39.50, page 579, a discussion of the question of fixing the date of this gradual injury as in the instant case. The author cites two cases in particular and says:

"* * * the date of accident for gradual loss of use of the hands was held to be the date on which this development finally prevented claimant from performing his work. The problem is thus solved in a manner which is familiar in a comparable area of occupational diseases."

■ What we have just said is particularly applicable in the instant case because two of the main defenses in addition to that of accident and injury, hereinbefore discussed, are that no notice was given and that the suit is barred by the statute of limitations. We alluded to this question of notice hereinbefore. It has many times been held by this Court that ignorance of the serious nature of the injury, or an injury insufficient to justify any complaint, is a matter which is properly to be considered by the court in determining the reasonableness of the excuse

of the employee for failure to give written notice as required by the statute (sec. 50-1001, T.C.A.). Such cases as *Marshall Construction Co. v. Russell*, 163 Tenn. 410, 43 S.W.2d 208; *McBrayer v. Dixie Mercerizing Co.*, 176 Tenn. 560, 144 S.W.2d 764, and *Edwards v. Harvey*, 194 Tenn. 603, 253 S.W.2d 766, are in point.

As indicated by the finding of fact of the trial judge he felt clearly that there was no necessity for the employee to have given notice of the claimed injuries herein until the time that the employee did go to his foreman and the First Aid Station about this hand. Then it was that the First Aid people told him to soak it in hot water, etc. This then amounted to the fact that the employer did have notice of the claimed injury and the hand didn't get better by doing what the First Aid people told him to do (the employee testifies that he told his foreman, Trent, about the injury about this time). Then it was that he went to his doctor and his doctor found what had happened, and the doctor then apparently was not sure because he told him to keep on working in a light way, and when this didn't aid him he was sent to a specialist on the subject and thus it was that within a month or so the man had to quit work.

A very interesting and able argument is made on behalf of the defendant that if the employer had known about this at the first instance that he might have done something about it and if the man had healed up he would not have gotten hurt. Under some instances, this would be very logical, but when you have an employee with just a jar or twist of this kind, it is almost unthinkable to think that an employee would go and report such a thing to his superior if the injury was no more than it is perfectly

obvious that it was in the first instance, just a little hurting, because it would give the impression that he was a baby and things of that kind. Thus it is that there is material evidence herein to show and support the finding of the trial judge that the employee as soon as he considered there was any particular seriousness about this that he did so report it. Under such circumstances it is hard for us to see how the employer could have been prejudiced by reason of the failure to give notice earlier, or how it was the duty or obligation of the employee to so do.

This question as raised in the assignments must be necessarily tied in with the assignment on failure to file the suit within the year from the discovery of the injury. Both are necessarily tied together in the claim of the employer that, if this was an injury and accident, notice should have been given and the suit brought when the first one of these pains was felt.

This kind of injury is very much like when you have the aggravation of a preexisting injury and if the final one of these things hurts to such an extent that then he went to the employer immediately this was within sufficient time to fix the notice. As said above in the quotation from Larson, ordinarily the fixing of time for these gradual injuries is the same as is done in occupational disease cases. Under our statute, covering these occupational diseases, the statute of limitations commences to run when the accumulated effects of the latent disease culminate in a disability which is traceable to such disease as the primary cause and which is apparent to the employee or could have been discovered by the exercise of reasonable care and diligence. *Norton v. Standard Coosa-Thatcher Co.*, 203 Tenn. 649, 315 S.W.2d 245. Thus it is that under this rule and obligation, when it is applied

to these gradual injury cases, and under the facts of this case, notice and the suit was brought well within the time, as is shown by the statement from the trial judge and what the doctors told this man about this injury.

While it is true the employee can point to no particular date or a praticular blow or jerking, or pulling in running this machine on the heavy soled shoes, which produced the injury, yet it is not necessary that the accident occur at any particular or specific time. The series of jerking or pulling or holding on this to the employee's hand produced the injury and loss which was unintended and an unexpected occurrence.

It is very forcibly argued that what has happened to the employee here comes in the category of occupational diseases and since it isn't one of those covered in the Act (sec. 50-1101) that it is not compensable, but that some day the Act may be so amended to take care of situations of this kind. This argument is made against the proposition that this is an injury. In other words, that it is not an injury but should be classed along with occupational diseases. The statute (sec. 50-1101, T.C.A.) defines occupational diseases and what are occupational diseases. Generally an occupational disease in addition to the definition in the statute is a disease that comes from common experience as visited upon persons engaged in a particular occupation, in the usual course of events, as a painter affected with lead colic or lead poisoning; phosphorous poisoning common to those who work in the manufacture of fireworks and things of that kind. In those instances, that of occupational diseases, these are diseases common to workers in those particular trades and do not ordinarily arise by accident as that term is used hereinabove.

 The court making a final award for the injuries herein used a statutory form that was not in effect at the time the injury happened and thus there is a slight error in this regard. This question though is not raised on the motion for a new trial, and it is argued now that since it was not brought to the attention of the trial court this Court should not consider it. In view of the fact though that the court allowed the employee the privilege of having an operation at the expense of the employer and certain disabilities for that time, and that it is not shown whether such operation has been performed or hasn't been, we deem out of all fairness to the parties that the case should be remanded to the trial court where correction may be made in the computation under the statute in force at the time of this injury and that the case remain on the docket there for the payment set forth in the finding by the trial judge plus those things he finds if an operation is had.

After a careful review of the case and authorities herein, we are satisfied that the judgment below should be affirmed with the modifications as suggested in the paragraph immediately preceding. Thus it is that the judgment below is affirmed.

## Petition to Rehear

The plaintiff in error, through able counsel, has filed a sincere petition to rehear in this case. The argument on this petition was the basic argument made in the original briefs and argument before this Court.

After again reviewing the matter we are satisfied that the questions raised on the petition to rehear were the identical questions presented and answered in our original opinion. The petition does not bring forward any

new question of law or fact. The facts quoted in the petition to rehear from the record were the same as those carefully considered by us in the first instance and from which we found there was material evidence to support the finding of the trial judge. This being true there is nothing that we can do about the matter.

In the petition to rehear counsel takes the position that the case of *Meade-Fiber Corporation v. Starnes,* 147 Tenn. 362, 247 S.W. 989, is in point in support of their petition to rehear, and it is a distinguishing case from that of *Shaw v. Musgrave,* cited in our original opinion. At the time we prepared the original opinion we considered this question. It is our studied view that the Meade case is not in point here, because the determinative question decided by this Court in the Meade case was that the claimed accident and injury there was a normal incident to the work rather than a fortuitous circumstance. In the present case the injury was not a natural incident to the work but was produced by fortuitous circumstances as pointed out in the original opinion.

After carefully studying the petition to rehear we are satisfied that a correct result under the facts of this case was reached in the original opinion and that nothing has been presented which should change the view as there expressed. Accordingly the petition to rehear is overruled.